## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**ARGONAUT INSURANCE COMPANY**                          CIVIL ACTION

**VERSUS**                                                              No. 21-1602

**ATLANTIC SPECIALTY INSURANCE**                          SECTION I
**COMPANY**

## <u>ORDER & REASONS</u>

Before the Court is a motion[1] for summary judgment filed by defendant
Atlantic Specialty Insurance Company ("ASIC"). Plaintiff Argonaut Insurance
Company ("Argonaut") opposes[2] the motion. ASIC filed a reply.[3] For the reasons that
follow, the Court will grant the motion and enter judgment in favor of ASIC.

## I.  BACKGROUND

### A. February 22, 2019 Collision

This action arises out of a 2019 vehicular collision in New Orleans, Louisiana,
and an ensuing tort action ("the underlying lawsuit") brought in Orleans Parish Civil
District Court.[4] The undisputed facts[5] are as follows: On February 22, 2019, Darrell
Esnault ("Esnault"), a commercial truck driver, was operating a 2005 Freightliner,
unit number TG27 (the "truck"), which was leased by Double S Transportation, LLC

---

[1] R. Doc. No. 17.

[2] R. Doc. No. 19.

[3] R. Doc. No. 22.

[4] R. Doc. No. 17-4.

[5] R. Doc. No. 17-2 (joint stipulation).

("Double S") to Triple G Express, Inc. ("Triple G").[6] Esnault delivered his final load of the day to the Norfolk Southern Railroad Terminal, located at 2900 Florida Avenue, New Orleans, Louisiana.[7] He departed the terminal at approximately 3:50 p.m., "bobtailing" the tractor of the truck—meaning that he was driving the tractor without a trailer attached to it.[8]

Esnault then traveled toward a Save-A-Lot grocery store located at the intersection of Paris Avenue and Mirabeau Avenue.[9] On the way, Esnault saw a friend on Paris Avenue, stopped for approximately five minutes, exited his vehicle, and spoke with his friend.[10] Thereafter, Esnault returned to his vehicle and continued traveling north on Paris Avenue towards the Save-A-Lot.[11] As Esnault drew closer to Save-A-Lot, he realized that he did not have enough cash to make his contemplated purchases, so he turned around and headed south on Paris Avenue towards Gentilly Boulevard "to go to his residence," where the truck is normally garaged.[12] Esnault reached the intersection of Paris Avenue and Gentilly Boulevard, which is approximately three to four blocks away from his residence.[13] "Then, Esnault turned right on Gentilly Boulevard to go to his residence, but before he got to his residence, he contemplated [purchasing cigarettes at] a Shell Station or a nearby convenience

---

[6] *Id.* at 1 ¶ 1.

[7] *Id.* at 2 ¶ 7.

[8] *Id.*; *see also* R. Doc. No. 17-9, at 6 (defining "bobtailing").

[9] R. Doc. No. 17-2, at 2 ¶ 8.

[10] *Id.* at 2 ¶ 9.

[11] *Id.* at 2 ¶ 10.

[12] *Id.* at 2 ¶¶ 11–13; R. Doc. No. 17-3, at 4 ¶ 19; R. Doc. No. 19-1, at 2 ¶ 19.

[13] R. Doc. No. 17-2, at 2 ¶ 12.

store located near the corner of Paris Avenue and Gentilly Boulevard, which would have required another U-turn in the opposite direction of his residence."[14]

As Esnault started to turn left from the outer lane to the left lane at the intersection of Gentilly Boulevard and Republic Street, in order to make the U-turn, a Nissan Altima, driven by Christian Davis ("Davis"), collided with the left side of the truck.[15] The accident occurred approximately 22 minutes after Esnault departed from the Norfolk Southern Railroad Terminal.[16] "If the accident had not occurred, Esnault would have eventually returned to his residence located at 2346 Gentilly Boulevard, New Orleans, Louisiana, and garaged his truck."[17]

**B. Insurance Policies**

At the time of the accident, Argonaut had issued Commercial Auto Policy Number AVT 100003600 to Triple G, which provided Motor Carrier Coverage in the amount of $1,000,000.[18] Additionally, ASIC had issued a policy to Triple G, which includes Non-Trucking Liability coverage ("the NTL policy"), the scope of which is specified in the policy's Section One.[19] The policy limit for Section One is $500,000.[20]

---

[14] R. Doc. No. 17-2, at 2 ¶ 13. Both parties have stipulated to the fact that Esnault intended to purchase cigarettes at the Shell station or convenience store. R. Doc. No. 33.

[15] *Id.* at 3 ¶ 14.

[16] *Id.* at 3 ¶ 15.

[17] *Id.* at 3 ¶ 16.

[18] R. Doc. No. 19, at 2.

[19] R. Doc. No. 17, at 6.

[20] *Id.*

The NTL policy states that Section One "only applies to **Losses** that occur . . . when a **Covered Truck** is **Non-Trucking**."[21] The policy states that a truck is "Non-Trucking" when it "is subject to an active **Permanent Lease** with a government regulated **Motor Carrier** <u>and</u> is either **Bobtail** or **Deadhead** <u>and</u> is operating solely for personal use unrelated to the business of the **Motor Carrier**."[22] The policy further provides that a truck is "<u>not</u> **Non-Trucking**" when it is "returning to the **Truck's Primary Garage Location** subsequent to delivering a load[.]"[23] The "**Primary Garage Location**" is "the home parking base for a **Truck** or the terminal from which the **Truck** customarily obtains hauling assignments."[24]

## C. Ensuing Litigation

In the underlying lawsuit, Davis named Argonaut, ASIC, Esnault, Double S, and Triple G as defendants.[25] Davis's state court petition stated that "at all material times . . . [Esnault] was on a mission and/or errand for [Triple G] and/or [Double S] on the date of this accident[.]"[26] Argonaut provided a defense to Esnault, Triple G, and Double S, and settled Davis's claims as to those defendants for $750,000.[27] The order of dismissal, executed in January 2021 as a result of the settlement, stated that Davis "retains all claims and rights . . . against Atlantic Specialty Insurance

---

[21] R. Doc. No. 17-9, at 9 (emphasis in original).

[22] *Id.* at 6 (emphasis in original). The parties do not dispute that the truck was subject to an active permanent lease with a government regulated motor carrier.

[23] *Id.* at 6–7.

[24] *Id.* at 7.

[25] R. Doc. No. 17-3, at 1.

[26] R. Doc. No. 17-4, at 3 ¶ VI.

[27] R. Doc. No. 19-1, at 1.

Company."[28] Davis assigned all of his remaining rights to Argonaut.[29] An order of dismissal as to all remaining defendants was executed on February 22, 2022.[30]

Argonaut filed the above-captioned action in this Court, seeking damages from ASIC.[31] Argonaut argues that ASIC's NTL policy covered the collision and, therefore, that ASIC should have been the primary insurer in settling Davis's claims.[32] Argonaut argues that ASIC had a duty to provide coverage and to defend Esnault and Triple G in the underlying lawsuit.[33] Argonaut argues that it has the right to recover $500,000 from ASIC—in other words, the maximum limit under ASIC's policy.[34] Additionally, Argonaut argues that it is entitled to recover special damages in the amount of $30,384.95 for the cost of defending the underlying lawsuit.[35]

In the instant motion for summary judgment, ASIC argues that its NTL policy did not cover the collision at issue and that Argonaut is not entitled to recover any damages from ASIC in connection with the underlying settlement. ASIC also submits that, even if the NTL policy covered the collision, ASIC did not have a duty to defend in the underlying lawsuit, and that Argonaut has no basis to seek contribution from ASIC, whether directly or through subrogation of Davis's claims.[36]

---

[28] R. Doc. No. 17-8.

[29] R. Doc. No. 17-7, at 5.

[30] R. Doc. No. 19-3.

[31] R. Doc. No. 1, at 6 ¶ 17.

[32] *Id.* at 4 ¶ 11, 6 ¶ 17.

[33] *Id.* at 6 ¶ 17.

[34] *Id.* at 5 ¶ 15.

[35] *Id.* at 6 ¶ 17.

[36] R. Doc. No. 17-1, at 10–12, 19–21.

## II.  STANDARD OF LAW

Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, the court determines that there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party seeking summary judgment need not produce evidence negating the existence of a material fact, but need only point out the absence of evidence supporting the other party's case. *Id.*; *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986).

Once the party seeking summary judgment carries its burden, the nonmoving party must come forward with specific facts showing that there is a genuine dispute of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Instead, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . . . the material may be

presented in a form that would not, in itself, be admissible at trial." *Lee v. Offshore Logistical & Transp., LLC*, 859 F.3d 353, 355 (5th Cir. 2017) (quotation omitted).

The party responding to the motion for summary judgment may not rest upon the pleadings but must identify specific facts that establish a genuine issue. *Anderson*, 477 U.S. at 248. The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255; *see also Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

### III. LAW AND ANALYSIS

"The interpretation of an insurance contract presents a question of law, rather than fact, and therefore is an appropriate matter for determination by summary judgment." *Martco Ltd. P'ship v. Wellons, Inc.*, 588 F.3d 864, 878 (5th Cir. 2009) (citations omitted). "Louisiana law provides that an insurance policy is a contract between the parties and should be construed using the general rules of contract interpretations set forth in the Louisiana Civil Code." *First Am. Bank v. First Am. Transp. Title Ins. Co.*, 585 F.3d 833, 837 (5th Cir. 2009). "The role of the judiciary in interpreting an insurance contract is to ascertain the common intent of the insured and insurer as reflected by the words of the policy." *Gorman v. City of Opelousas*, 148 So. 3d 888, 892 (La. 2014) (quoting *Peterson v. Schimeck*, 729 So. 2d 1024, 1028 (La. 1991)). "When the words of an insurance contract are clear, explicit and lead to no absurd consequences, courts must enforce the contract as written and make no further interpretation in search of the parties' intent." *Id.* (quoting *Peterson*, 729 So. 2d at 1028); *see also* La. Civ. Code. art 2046.

"Ambiguous policy provisions are generally construed against the insurer and in favor of coverage." *Cadwallader v. Allstate Ins. Co.*, 848 So. 2d 577, 580 (La. 2003). "Under this rule of strict construction, equivocal provisions seeking to narrow an insurer's obligation are strictly construed against the insurer." *Id.* However, this principle "applies only if the ambiguous policy provision is susceptible to two or more *reasonable* interpretations." *Id.* (emphasis in original). "An insurance policy should not be interpreted in an unreasonable or strained manner so as to enlarge or to restrict its provision beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion." *Lodwick, LLC v. Chevron U.S.A., Inc.*, 126 So. 3d 544, 549–50 (La. App. 2 Cir. 2013). "Likewise, a court should not strain to find ambiguity in a policy where none exists." *Id.*

ASIC contends that, because "Esnault was returning from dropping off a load at the time of this accident, and would not have even been operating the Truck at all had it not been for the delivery he had been obligated to make, it is clear that he was not operating the subject Truck ***solely for personal use*** at the time the accident occurred, such that the underlying claim is properly excluded from coverage under this general definition alone."[37]

Argonaut states that it is "is not taking the position that any 'route deviation' . . . would have triggered ASIC's Non-Trucking coverage" and suggests, for instance, that stopping to purchase gas or to use the restroom would not be considered "non-

---

[37] R. Doc. No. 17-1, at 13 (emphasis in original).

trucking."[38] However, Argonaut submits that stopping to "purchase groceries or cigarettes" is "purely . . . personal" in nature, such that the driver would be considered to be "non-trucking."[39] Argonaut also emphasizes the fact that Esnault needed to make a U-turn and travel away from his residence in order to complete his contemplated stop at a nearby Shell station or convenience store.

First, the Court looks to the term "Non-Trucking," which is defined, in relevant part, as when a truck is "operating solely for personal use unrelated to the business of the Motor Carrier."[40] The inclusion of the term "solely" in this definition is significant, because it indicates that the policy contemplates that a truck may simultaneously be put to both business and personal use. Additionally, the relevant coverage exception, which applies when the truck is "returning to the Truck's Primary Garage subsequent to delivering a load,"[41] does not state that the return trip must be the most direct route possible, nor does it explicitly preclude drivers from making brief stops or detours along the way.

The caselaw on this issue, although sparse, supports the interpretation that minor personal detours do not render a truck to be "non-trucking." For instance, in *Great West Casualty Insurance Co. v. Burns*, 2020 WL 2776495 (M.D. Ga. May 28, 2020), the court considered the same ASIC Non-Trucking policy in a context that bears some factual similarities to the instant case. The court concluded that if a truck

---

[38] R. Doc. No. 19, at 6.

[39] *Id.*

[40] R. Doc. No. 17-9, at 6.

[41] *Id.* at 7.

driver made a "personal errand to grab food" while he was *en route* to pick up a load, this would "not change the essential nature of his trip." *Id.* at *8. Such a stop would be a "minor personal detour," which "would not have altered the reason he was operating his tractor that morning, which was to further [his carrier's] commercial interests by picking up a load[.]" *Id.*[42] *See also, e.g.*, *Forkwar v. Empire Fire & Marine Ins. Co.*, 487 F. App'x 775, 780 (4th Cir. 2012) (concluding that a "business use" exception applied, despite the fact that the truck driver stopped for a meal on his way to pick up a load that he had been tasked with retrieving). The parties have not provided, nor is the Court aware of, any cases in which a court has concluded that a short personal detour effectively rendered the driver to be "non-trucking."

Argonaut points to the fact that the General Policy Definitions section of the policy defines the term "Route Deviation" as  meaning "a deviation from the customary business route to pursue personal interests,"[43] and asserts that this term must be read in harmony with the relevant exception to the Non-Trucking coverage.[44] However, as ASIC notes, "none of the relevant policy provisions at issue in this case make use of the defined term 'Route Deviation' or otherwise indicate that they are

---

[42] Ultimately, evidence in the record conflicted with the driver's testimony that he intended to make a brief detour for a meal. *Burns*, 2020 WL 2776495, at *8–9. Because there were genuine disputes of material fact as to the driver's intended destination, among other things, the court denied the motion for summary judgment. *Id.* at *9. No such factual disputes exist in this action because the parties have jointly stipulated that Esnault intended to get cigarettes at a nearby gas station or convenience store prior to the collision. *See supra* n.14.

[43] R. Doc. No. 17-9, at 7.

[44] R. Doc. No. 19, at 6.

made subject to that term in any way."[45] Additionally, ASIC persuasively asserts that "[t]he fact that the return trip provision does not reference Route Deviations *hurts* rather than helps Argonaut's argument" because "[t]he provision could have specifically excepted Route Deviations from its scope but plainly does not."[46]

"That 'contractual language may, on occasion, pose difficult factual applications . . .' and that the parties disagree as to coverage, does not create ambiguity." *Mahaffey v. Gen. Sec. Ins. Co.*, 543 F.3d 738, 741 (5th Cir. 2008) (quoting *Empire Fire & Marine Ins. Co. v. Brantley Trucking, Inc.*, 220 F.3d 679, 681 (5th Cir. 2000)). The Court concludes that the language of the NTL policy is unambiguous, and that the NTL policy does not cover the collision at issue in this action. However, to the extent that the policy might be deemed ambiguous, the Court also concludes that Argonaut's proffered interpretation is unreasonable.

Specifically, it would be unreasonable to interpret the policy as preventing drivers from making brief stops or detours to tend to basic personal needs. For instance, it would be difficult to believe that the NTL policy would preclude a driver from stopping to use the restroom. Similarly, it would be difficult to believe that the policy would preclude a driver experiencing drowsiness from stopping for coffee or to stretch his legs. Argonaut, for its part, at least concedes that stopping for gas or to use the restroom would not render the driver "non-trucking," but maintains that stopping for groceries or cigarettes is purely personal in nature, and would render the

---

[45] R. Doc. No. 22, at 6.

[46] *Id.* at 6–7.

driver "non-trucking."[47] However, the text of the policy provides no basis for drawing such distinctions. While stopping for gas is perhaps an example of a detour that could be described as solely for business purposes, any other kind of detour—including a stop to use the restroom, or to get coffee or food—could be characterized as at least partially personal in nature. The Court concludes that it would be unreasonable to read the NTL policy as precluding stops or detours of any kind whatsoever, and further concludes that it would be unreasonable to read Argonaut's proposed distinctions into the policy.

Argonaut also cautions that, "[i]n essence, ASIC's position is that until Esnault returned home, he was not Non-Trucking, no matter what he was doing or where he was going."[48] The Court does not believe that such an extreme implication flows from its interpretation of the policy. Future cases may present factual scenarios that test the outer boundaries of the NTL policy, but the instant case does not. The collision occurred approximately 22 minutes from the time that Esnault left the Norfolk Southern Railroad Terminal.[49] While Esnault did not take the most direct route home after dropping off his last load of the day, he also did not stray far from the route. He briefly drove towards a grocery store, before realizing that he did not have sufficient cash and drove towards his residence.[50] He stopped for five minutes to talk with a

---

[47] R. Doc. No. 19, at 6.

[48] *Id.* at 4.

[49] R. Doc. No. 17-2, at 2 ¶ 12.

[50] *Id.* at 2 ¶¶ 8, 10, 11.

friend whom he saw on the street.[51] His subsequently-contemplated trip to a nearby gas station or convenience store, while requiring him to drive in the opposite direction of his residence, would have taken him approximately three to four blocks away from his residence, at most.[52] The Court concludes, in light of the limited purpose, distance, and duration of Esnault's attempted detour, that the truck was not being operated solely for personal use at the time of the collision.

In sum, the Court concludes that the NTL policy is unambiguous. However, to the extent that the NTL policy could be deemed ambiguous, Argonaut's proposed interpretation is unreasonable. *Cadwallader*, 848 So. 2d at 580. The Court therefore concludes that the NTL policy did not apply at the time of the collision. Having so concluded, the Court declines to reach the parties' arguments as to ASIC's duty to defend and contribution. Accordingly,

**IT IS ORDERED** that the motion for summary judgment is **GRANTED** and that plaintiff's claims are **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana, May 9, 2022.

_____
**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**

---

[51] *Id.* at 2 ¶ 9.

[52] *Id.* at 2 ¶ 12. The Court does not deem the fact that Esnault's contemplated detour required him to drive in the opposite direction of his primary garage to be dispositive. Detours, by definition, require the driver to depart from the most direct route to some degree. Whether the detour entails a U-turn or, for instance, exiting a highway to drive to a nearby gas station, is of little import. The purpose, distance, and duration of the detour bear more relevance to the inquiry.